THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBIN VERNON, et al.,<br><br>                  Plaintiffs,<br><br>   vs.<br><br>QWEST COMMUNICATIONS<br>INTERNATIONAL, INC., et al.,<br><br>               Defendants. | Case No. 08-1516 TSZ<br><br>DEFENDANTS' MOTION TO DISMISS<br>FIRST AMENDED COMPLAINT<br><br>**NOTE ON MOTION CALENDAR:**<br>**FRIDAY, APRIL 17, 2009**<br><br>**ORAL ARGUMENT REQUESTED** |

Qwest Communications International Inc., Qwest Services Corp., Qwest Corp., Qwest Communications Corp., and Qwest Broadband Services, Inc. (collectively "Defendants" or "Qwest") hereby move to dismiss the Plaintiffs' First Amended Complaint ("FAC").

## INTRODUCTION

After the briefing on Qwest's Motion to Dismiss the original Complaint was completed, the Plaintiffs filed the FAC, joining another named Plaintiff. Although the Plaintiffs had the opportunity to address many of the deficiencies in the Complaint with the FAC, they did not, and the deficiencies remain.

1       Like the original Complaint, the FAC should be dismissed because Plaintiffs' claims are

2  barred in whole or in part by the filed tariff doctrine, because Plaintiffs lack standing to bring their

3  claims, because Plaintiffs claim that five Qwest Defendants fraudulently misled them and yet

4  Plaintiffs fail to plead these claims with the required specificity, and because Plaintiffs have failed to

5  plead claims upon which relief may be granted.

6       First, any claims based on contracts formed or upon Qwest's purported representations made

7  before January 28, 2006 are barred by the filed tariff doctrine.  Plaintiffs Vernon and Durkin claim

8  that they began subscribing to Qwest's internet service in 2004 and 2005, respectively.  Plaintiffs also

9  seek to represent a class of "customers, who, since October 15, 2002, have been subject" to a

10  termination liability assessment that applies to those subscribers who breach their two-year high

11  speed internet service contract.  (Am. Compl. ¶ 36.)  Yet, prior to January 28, 2006, the high speed

12  internet services to which Plaintiffs subscribed were governed by tariffs filed with the Federal

13  Communications Commission ("FCC").  During that period, Qwest could only offer internet service

14  in accordance with the filed tariffs.  Accordingly, these mandatory federal tariff filings bar any claim

15  or liability that arose prior to the deregulation for alleged high speed internet contracts, and such

16  claims must be dismissed.

17       Second, Plaintiffs have failed to establish standing as to a claim against any particular named

18  Defendant and lack standing as to the majority of the claims they assert.  Although Plaintiffs have

19  named five separate Qwest entities, the Plaintiffs have never identified which entity provided them

20  with service, which entities they have had communications with, or even which entity sent them the

21  bill containing the charge that they now challenge.  As such, Plaintiffs have failed to establish

22  standing against any particular Defendant.  Moreover, Plaintiffs lack standing to assert claims for

23  violations of consumer protection act claims in states where they do not reside.

24       Third, Plaintiffs have brought claims sounding in fraud, but have failed to plead such claims

25  with the required particularity.  Plaintiffs claim that Qwest omitted material information – the

existence of a contract term or duration and the corresponding consequence for a breach of that term – in order to induce Plaintiffs and other class members to sign up for Qwest's high speed internet service. Plaintiffs assert that once Qwest had lured the subscribers to its service, it used the hidden termination liability to "lock" the subscribers into Qwest's service by misrepresenting that they had agreed to the term contract. Plaintiffs also claim that Qwest affirmatively misrepresents the existence of the contracts. These claims of material omissions and affirmative misrepresentations all sound in fraud, but Plaintiffs have failed to plead the details necessary to sustain such claims against a motion to dismiss. Moreover, Plaintiffs' claims regarding fraud as to Plaintiffs Vernon and Durkin must fail as a matter of law on the grounds that when these Plaintiffs first signed up for internet services with Qwest, the services were governed by filed tariffs. There was no contract to lure Plaintiffs to, nor were there any hidden terms and fees – there could not have been because all of the terms and conditions were contained in the public tariffs as mandated by the FCC.

Finally, Plaintiffs' claims suffer from other defects as well. For example, Count I for "unlawful penalties" does not state a claim that is recognized in any state where Qwest provides its high speed internet service. Count II for unjust enrichment cannot be maintained in the face of the express contract, the High Speed Internet Subscriber Agreement ("Subscriber Agreement" or "Agreement") that governs the parties' relationship. And Count IV for a declaratory judgment fails because it does not allege any basis for declaratory relief, let alone the application of the statute of frauds.

## FACTUAL AND PROCEDURAL BACKGROUND

Qwest Corporation has been providing high speed internet services to subscribers in fourteen states since 2000.[1] (*See* Qwest Commc'ns Int'l 2001 Form 10-K at 6, Travis Leo Decl., Ex. A.) Qwest and its predecessors have historically provided traditional telephone

---

[1] Qwest provides residential high speed data service in Arizona, Colorado, Iowa, Idaho, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming.

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 3

08-1515 TSZ

1   services.   Qwest was therefore considered a "facilities-based wireline broadband Internet

2   access service provider," subject to FCC regulation.  *See, e.g.*, Report and Order and Notice of

3   Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet over*

4   *Wireline Facilities*, 20 F.C.C.R. 14853, ¶ 4 (2005) ("FCC Wireline Broadband Order").   The

5   FCC eventually deregulated high speed internet services offered by companies such as Qwest,

6   but before January 28, 2006, Qwest provided this service to subscribers pursuant to tariffs that

7   were required to be filed with the FCC.  (Qwest Tariff No. 1, effect. through January 27, 2006;

8   Janila Beach Decl., Ex. H.)

9          As part of the deregulation process, Qwest sent letters to every internet subscriber,

10   explaining that the service would soon be deregulated and that if they wanted to maintain their

11   service, it would be governed by the Subscriber Agreement.  (Leo Decl. ¶ 9.)  Beginning in

12   January 2006, customers were given several months to decide whether to maintain their

13   service, pursuant to the terms and conditions of the Subscriber Agreement, or to cancel their

14   service to avoid the terms of the contract.  (*See* Sample Letter to Customers December, 2005,

15   Leo Decl., Ex. J.)  A customer who did not want to be governed by the Subscriber Agreement

16   was allowed to cancel its service without penalty.  (Leo Decl. ¶ 10.)

17          Qwest now provides its high speed internet service subject to a Subscriber Agreement.

18   (Am. Compl.  ¶¶ 13, 29; Leo Decl. ¶ 9, Ex. B.)  In the "Term and Termination" section of the

19   Subscriber Agreement, there is one set of terms for subscribers who elect to take services on a

20   month-to-month basis and a different set for those subscribers who agree to a two-year

21   contract.   (Sub. Ag. ¶¶ 12(b)(c), Leo Decl., Ex. B.)   Qwest began offering the two-year

22   contract in the spring of 2006 in a promotion known as "Price for Life."  (Leo Decl. ¶ 17.)

23   Price for Life subscribers are guaranteed one low rate for as long as they maintain their service

24   without change.  (*Id.*)  In contrast, a subscriber who takes monthly service without a two-year

25   commitment is subject to the possibility of subsequent rate increases.  (*Id.*)  In exchange for

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 4

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   receiving the permanent Price for Life discounts, a Price for Life subscriber agrees to purchase

2   the high speed internet service for at least two years.  (*Id.*; Ex. B ¶ 12(c).)  The Price for Life

3   subscribers also agree that if they breach the contract by terminating before two years have

4   expired, they will pay a $200 early-termination charge or termination liability assessment

5   ("TLA").  (Ex. B ¶ 12(c).)  A subscriber who selects the multiyear Price for Life promotion

6   confirms his or her agreement and order before the order is complete.  (Leo Decl. ¶¶ 18, 20.)

7        Additionally, shortly after subscribers sign up for Qwest's high speed internet or change

8   the terms of their services (*e.g.*, by upgrading the speed of service), they receive a letter that

9   identifies the services and products ordered.  (*Id.* ¶ 22.)  When the subscriber has selected Price

10  for Life, the letter informs the subscriber about the two-year term commitment, the

11  corresponding $200 TLA, and how to review the Subscriber Agreement.  (*Id.*)  The Subscriber

12  Agreement provides that a subscriber may cancel his service in the first 30 days, and Qwest

13  will waive the TLA if he does not agree with the terms and conditions in the Subscriber

14  Agreement.  (Ex. B ¶ 12(a)(iii).)

15       Plaintiff Vernon asserts that, in approximately 2005, she ordered internet service

16  through Qwest and upgraded to Price for Life in April 2007.  (Am. Compl. ¶ 18.)  She says she

17  called Qwest to cancel her internet service in approximately May 2008 and was told that there

18  was no cancellation fee, but later received a bill that included a $200 TLA, which she has not

19  paid.  (*Id.* ¶ 23.)

20       Plaintiff Durkin began subscribing to Qwest's internet service in 2004 and upgraded to

21  Price for Life in approximately March 2007.  (*Id.* ¶ 25.)  Durkin cancelled his internet

22  subscription in 2008 after being informed that the cancellation would result in the imposition

23  of the $200 TLA.  (*Id.* ¶ 28.)

24

25

1    Plaintiff Sandquist subscribed to Qwest's Price for Life internet service beginning in

2 August 2007. (Am. Comp. ¶ 29.)  He then cancelled in December 2008 and paid the TLA.  (*Id.*

3 ¶¶ 30, 32.)

4    The Plaintiffs purport to be suing on behalf of all similarly situated Qwest Price for

5 Life customers who were charged the TLA.  (*Id.* ¶ 32.)

6                                            **ARGUMENT**

7 **I.    PLAINTIFFS' CLAIMS THAT AROSE BEFORE 2006 ARE BARRED BY THE**
         **FILED TARIFF DOCTRINE.**

8        Plaintiffs purport to represent a class of Qwest customers "who, since October 15,

9 2002, have been subject to" a TLA.  (*Id.*)  Plaintiffs' or any class claims arising before

10 January 28, 2006, however, are barred by the filed tariff doctrine under federal law.  Prior to

11 January 28, 2006, Qwest's high speed internet services were offered pursuant to tariffs that

12 Qwest was required to file with the FCC.  These mandatory tariffs have the force of federal

13 law, and Plaintiffs may not pursue any claim that would have the effect of altering Qwest's

14 tariffed rates, including any TLA.  Indeed, any claim that is based upon the relationship

15 between the parties prior to January 2006 must fail on the grounds that the filed tariffs

16 completely governed Qwest's actions at that time.

17
         **A.    Until January 28, 2006, The Terms Of Qwest's High Speed Internet Were**
18             **Governed By Mandatory Tariffs.**

19        Until recently, Qwest's high speed internet service was subject to FCC regulation.

20 Qwest was a "facilities-based wireline broadband Internet access service provider."  *See*

21 *generally* FCC Wireline Broadband Order, 20 F.C.C.R. 14853.  While Qwest's high speed

22 internet services were regulated, Qwest was required to file tariffs with the FCC that detailed

23 the rates and terms upon which Qwest offered such services.  (Qwest Tariff No. 1, Beach

24 Decl., Exs. H-I.)  Qwest could not deviate from these tariffs and was required to provide its

25 internet services to all subscribers – residential, business, retail and wholesale – on non-

1   discriminatory terms.  *See* 47 U.S.C. § 203(c).  Moreover, the terms and conditions of the

2   service were entirely governed by the tariffs.  Qwest could not offer separate contracts for the

3   services.  Customers were not misled as to the terms of their services because those terms were

4   incorporated into the tariffs, which having the force of law, were readily available for any

5   customer to review at any time.

6          On September 23, 2005, the FCC entered a Report and Order to deregulate wireline

7   broadband Internet access services provided by facilities-based carriers, such as Qwest.  *See*

8   FCC Wireline Broadband Order; *see also Time Warner Telecom Inc. v. FCC*, 507 F.3d 205,

9   213-24 (3d Cir. 2007) (rejecting challenge to Wireline Broadband Order).  This Report and

10  Order was published on October 17, 2005 and became effective on November 16, 2005.  The

11  Wireline Broadband Order permitted facilities-based high speed internet service providers such

12  as Qwest to either continue providing their service as a common carrier or to offer such

13  services on a de-tariffed basis.  *See* FCC Wireline Broadband Order ¶ 5.  Qwest elected to

14  begin providing its high speed internet service on a de-tariffed basis and filed an amended

15  tariff with the FCC.  Qwest's new tariff became effective on January 28, 2006, and high speed

16  internet customers who subscribed after this date were no longer offered services under

17  Qwest's tariffs.  (*See* FCC Tariff No. 1 § 8.994, Beach Decl., Ex. I.)

18          **B.     The Filed Tariff Doctrine Bars Plaintiffs' Claims Arising Out Of Conduct
                   Prior To January 28, 2006 As A Matter Of Law.**

19          The filed tariff doctrine bars any claims related to the TLA that arose before January

20  28, 2006.  As a common carrier subject to regulation with respect to its internet services,

21  Qwest was required to file tariffs addressing its charges and the practices and regulations

22  affecting such charges.  *See* 47 U.S.C. § 203(a).  Qwest's filed tariff had the effect of law,

23  prohibiting Qwest from deviating from such tariff, regardless of what representations it made

24  to its customers.  *See* 47 U.S.C. § 203(c); *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524

25  U.S. 214, 222 (1998).  Just as Qwest could not alter its rates, terms or conditions, Plaintiffs

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 7

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   cannot challenge or alter such rates, terms or conditions through state law claims.  *See id.*;

2   *Brown v. MCI WorldCom Network Servs.*, 277 F.3d 1166, 1170 (9th Cir. 2001) ("Under the

3   filed tariff doctrine, no one may bring a judicial challenge to the validity of a filed tariff.").

4          Courts have routinely recognized the applicability of the filed tariff doctrine to claims

5   such as those asserted by Plaintiffs.  For example, in *Bryan v. BellSouth Communications, Inc.*,

6   377 F.3d 424, 430 (4th Cir. 2004), plaintiff filed a class action complaint alleging that

7   BellSouth's Federal Universal Service Charges ("FUSC") passed on to customers were

8   excessive, and that BellSouth failed to disclose information about the FUSC to customers in

9   violation of North Carolina law prohibiting "unfair or deceptive" trade practices.  Regarding

10  plaintiff's request for a refund of a portion of the FUSC, the court held:  "[T]he amount of the

11  FUSC is determinatively set forth in BellSouth's tariff, which carries the force of federal law . .

12  . .  [B]ecause [plaintiff's claim] would require the court to determine a reasonable rate for the

13  FUSC, that claim must be dismissed pursuant to the filed-rate doctrine."  *Id.* at 432.  "[T]he

14  filed tariff doctrine bars even claims for misrepresentation or fraud based on a carrier's alleged

15  nondisclosure of a tariff . . . ."  *Hardy v. Claircom Commc'n Group, Inc.*, 86 Wn. App. 488,

16  492, 937 P.2d 1128, 1131 (W. Ct. App. 1997).

17         In addition to rates, the tariffs also completely governed the terms and conditions by

18  which Qwest offered its internet service prior to deregulation.  As such,  "the filed-rate doctrine

19  bars state-law claims not only that pertain directly to the price of telecommunications services

20  subject to [a regulatory] filing, but also state-law claims that concern various *nonprice* aspects,

21  such as 'service, provisioning, and billing options.'"  *ICOM Holding, Inc. v. MCI Worldcom,*

22  *Inc.*, 238 F.3d 219, 222 (2d Cir. 2001) (quoting *Cent. Office Tel.*, 524 U.S. at 220) (emphasis in

23  the original).  Accordingly, to the extent that Plaintiffs base claims upon and seek damages for

24  any alleged omissions or misrepresentations pertaining to alleged contract terms and conditions

25  on which Qwest offered its services prior to deregulation, those claims are barred.  *See Cent.*

08-1515 TSZ

1   *Office Tel.*, 524 U.S. at 222 (holding that carrier cannot be held to a "promised rate if it

2   conflicts with the published tariff").

3   **II.      PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS.**

4          Plaintiffs fail to establish standing for their claims against any particular named

5   Defendant, and cannot establish standing to assert state law claims in states where they have no

6   contacts.   A complaint must allege facts showing that a plaintiff has standing as to each

7   defendant.  *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982) (citation omitted) (holding that

8   unless plaintiffs can demonstrate the requisite case or controversy between themselves

9   personally and each defendant, no plaintiff may seek relief on behalf of himself or any other

10  member of the class); *see also Herlihy v. Ply-Gen Indus., Inc.*, 752 F. Supp 1282, 1291 (D. Md.

11  1990) (holding plaintiffs lack standing "in the absence of an allegation of specific wrongful

12  conduct of a named defendant. . . . ")

13         First, Plaintiffs fail to allege sufficiently that they have been injured by a particular

14  Defendant's alleged conduct.  No Plaintiff alleges that she or he:  (i) contracted with a *specific*

15  Defendant; and (ii) was charged a TLA by a *specific* Defendant.  Instead, without explanation

16  Plaintiffs claim they each received a bill from the generic "Qwest" and that their bills included

17  a TLA.  (Am. Compl.  ¶¶ 19, 27.)  There are no allegations as to each Defendant's individual

18  role in the events alleged in the FAC, and there are no allegations to support the bald

19  contention that Plaintiffs had a relationship with each Defendant.  There is no basis to conclude

20  that each named Defendant allegedly engaged in conduct directed at, or that caused any injury

21  to, Plaintiffs.  *See Tajalle v. City of Seattle*, No. C07-1509Z, 2008 WL 630061, at *3 (quoting

22  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955, 1966 (2007)) ("When a

23  complaint fails to adequately state a claim, such deficiency should be 'exposed at the point of

24  minimum expenditure of time and money by the parties and the court.'").

25

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1      Second, Plaintiffs lack standing to assert claims under the consumer protection act

2  statutes of states where the Plaintiffs do not reside.  "[A]t least one named plaintiff must have

3  standing with respect to each claim the class representatives seek to bring." *In re Ditropan XL*

4  *Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (citing *Griffin v. Dugger*,

5  823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at

6  least one named plaintiff has suffered the injury that gives rise to that claim.")); s*ee also In re*

7  *Apple & AT&TM Antitrust Litig.*, No. C 07-05152 JW, 2008 WL 4810067, at *15-17 (N.D.

8  Cal. Oct. 1, 2008).  Here, the Plaintiffs reside in Washington and Minnesota, respectively, but

9  purport to assert claims under consumer protection acts in twelve other states.  Any claims for

10  states outside their respective states of residency should be dismissed.

## III.   PLAINTIFFS FAIL TO PLEAD COUNTS II AND III WITH PARTICULARITY.

12      The Plaintiffs have pled no additional facts in the FAC to support the particularity

13  requirements of their consumer protection act and unjust enrichment claims.  As with the

14  original Complaint, the claims sound in fraud and should be dismissed for failure to be pled

15  with particularity.

### A.   Plaintiffs Allege A Uniform Course Of Fraudulent Conduct By Qwest.

17      The Plaintiffs' consumer protection act and unjust enrichment claims distill down to the

18  allegations of fraud: that Qwest intentionally concealed and misrepresented information to

19  induce Plaintiffs to accept Qwest's service and to deter Plaintiffs from canceling service, all for

20  Qwest's alleged benefit. (*See* Am. Compl. ¶¶ 20-22, 26, 28, 60.)  A claim "sounds in fraud"

21  when it relies on a unified course of fraudulent conduct.  *See, e.g.*, *Vess v. Ciba-Geigy Corp.*

22  *USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  Though Plaintiffs avoid using the term "fraud,"

23  their FAC relies on a unified course of fraudulent conduct.  *Cf. Anderson v. Clow (In re Stac*

24  *Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) (noting failure to use word "fraud"

25  does not change nature of claim).  Qwest is alleged to have made material omissions and

08-1515 TSZ

1  misrepresentations to all of its individual high speed internet customers, knowing of the

2  statements' falsity, with the intent to induce Plaintiffs to buy or continue Qwest's service, and

3  Plaintiffs and other class members relied on those misrepresentations in obtaining and

4  maintaining Qwest's services.   These facts, which form the basis of Plaintiffs' consumer

5  protection/fraud act claims and their unjust enrichment claim, sound in fraud.

6        When, as here, unjust enrichment claims and those brought under state consumer

7  protection acts sound in fraud, Rule 9(b) requires that fraud be alleged with particularity as to

8  "who, what, when, and where" constituted the fraud.  *See, e.g.*, *Duran v. Clover Club Foods*

9  *Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985) ("[A]llegations of deceptive trade practices under

10  the [Colorado Consumer Protection] Act are subject to Rule 9(b)'s requirement of

11  particularity."); *Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 963-64 (D. Minn. 2000)

12  (same with regard to Minnesota law).

13        In *Fidelity Mortgage Corp. v. Seattle Times Co.*, 213 F.R.D. 573 (W.D. Wash. 2003),

14  plaintiffs claimed that defendant violated, *inter alia*, the Washington Consumer Protection Act,

15  in publishing interest rates.   The court noted that "[a]ll of plaintiff's claims rest on the

16  allegation that defendant Seattle Times Co. 'knowingly publish[es] false, deceptive, and/or

17  misleading Interest Rates in [their] Print and Online publications.'"   *Id.* at 574 (citing

18  complaint).  The court held that the complaint "evidence[d] allegations that 'sound in fraud,'"

19  and granted the motion to dismiss.   *Id.*   So, too, in the instant case where Plaintiffs allege a

20  purportedly Qwest-wide practice of omissions and misrepresentations designed to benefit

21  Qwest to the detriment of its customers.  *See also Sparling v. Daou (In re Daou Sys.)*, 411 F.3d

22  1006, 1028 (9th Cir. 2005) (holding that a putative class action complaint alleging a fraudulent

23  scheme and course of business by defendants sounded in fraud, when the "complaint goes on

24  to allege myriad misrepresentations made by defendants, of which defendants had full

25  knowledge, which induced plaintiffs' reliance, and which caused plaintiffs' damages").

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 11

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1

### B.      Plaintiffs Fail To Plead Their Claims With Requisite Particularity.

2           None of the Plaintiffs allege with particularity the circumstances surrounding the

3    omissions or misrepresentations Qwest allegedly made prior to Plaintiffs signing up for high

4    speed internet service or when Plaintiffs canceled their services.

5           With respect to Plaintiff Vernon, it is not clear **when** Plaintiff Vernon claims she was

6    deceived by Qwest.  Vernon claims that, prior to deregulation, "[i]n approximately 2005, she

7    and her husband Robert ordered internet service through Qwest." (Am. Compl. ¶ 18.) But she

8    also asserts that Qwest told her that her husband had entered into a contract with Qwest

9    "approximately two years after the Vernons initially ordered internet service with Qwest." (*Id.*

10   ¶ 20.)  Further, it is not clear **how** Qwest misled Vernon because the FAC is vague as to

11   whether Vernon denies that her husband had contact with Qwest two years into the service or

12   whether she denies that in doing so, Mr. Vernon entered into a term contract with Qwest.  It is

13   not clear **who** was allegedly misled – was it Ms. or Mr. Vernon in 2005 under the tariffs,

14   Mr. Vernon in 2007 when he ordered and accepted the Price for Life contract, or Ms. Vernon

15   in 2008 when she was billed for the TLA?

16          Plaintiff Durkin's claims fare little better.  While Durkin alleges that he responded to an

17   advertisement in March of 2007, this advertisement is not alleged to have omitted information

18   about the term commitment and TLA.  (*Id.* ¶ 25.)  It is not clear that the advertisement to which

19   Durkin responded was even targeted toward the service or promotion that Durkin later

20   requested.  Durkin alleges that Qwest did not disclose, on his March 2007 telephone call to

21   order service, that he would be subject to a $200 TLA if he cancelled service within two years.

22   (*Id.*)  But even assuming that this identifies a material omission with particularity, it still fails

23   adequately to explain "why the . . . omission complained of was false or misleading."  *In re*

24   *GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded by statute on other

25   grounds).  In particular, Mr. Durkin does not allege that he was not otherwise aware of the

1  terms and conditions of the internet services he was to receive or that he was not pointed to

2  Qwest's website and the attached Subscriber Agreement, setting forth the terms and conditions

3  governing his contract.  He does not, in other words, "give particulars as to the respect in

4  which plaintiff contends the statements are fraudulent."  *See Fidelity*, 213 F.R.D. at 575.[2]

5      Plaintiff Sandquist's allegations are similarly deficient.  He alleges that he signed up for

6  internet service by phone and was likewise not advised of the $200 TLA.  (Am. Compl. ¶ 29.)

7  As with Mr. Durkin's allegations, Mr. Sandquist does not allege how the omission was false or

8  misleading, that he was not otherwise aware of the terms and conditions of the internet services

9  he was to receive, that he was not pointed to Qwest's website or that he did not otherwise

10  receive a copy of the Subscriber Agreement.

11      In short, one cannot discern from the FAC when and how the Plaintiffs claim to have

12  been misled.  Either Plaintiffs and putative class members are subject to a TLA, and the terms

13  of that TLA are deliberately concealed, which is an omission, *or* Plaintiffs are not subject to a

14  TLA but are told that they are, which is a misrepresentation.  But both cannot be true.  These

15  general, contradictory allegations in support of claims sounding in fraud do not satisfy Rule

16  9(b)'s particularity requirements.  *Cf.  Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 955 (E.D.

17  La. 1996) (dismissing complaint under Rule 9(b) when "it is difficult to determine from

18  plaintiffs' complaint what information the defendants are alleged to have disclosed to the

19  plaintiffs and what information they are alleged to have failed to disclose.  The complaint is

20  internally contradictory on these issues.").

21      Plaintiffs' claims concerning the broad class of omissions in advertising, purportedly

22  applicable to all putative class members, are likewise deficient.  Plaintiffs allege that Qwest

---

[2] Like Ms. Vernon, Mr. Durkin also alleges that he never received a written contract.  (Am. Compl. ¶ 25.)  This allegation suffers from the same flaw as the alleged non-disclosure over the phone – there is no allegation that Mr. Durkin was not otherwise aware of, or pointed to, the terms and conditions of the services he received from Qwest.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   advertises its high speed internet services to consumers "on local phone bills[,] . . . on the

2   internet, on television and by mailing unsolicited promotional materials throughout its service

3   area." (Am. Compl. ¶ 11.)  This advertising, according to Plaintiffs' FAC "does not disclose

4   many of the terms and conditions Qwest later seeks to impose on its customers, including a

5   term commitment and a $200 [TLA]." (*Id.*)  Such general allegations do not suffice under

6   Rule 9.  *Cf., e.g., Anderson*, 89 F.3d at 1410 (9th Cir. 1996) ("[Plaintiff] states time, place and

7   content of the road-shows in the broadest of terms, and suggests that Stac officers made

8   positive forecasts to promote the Stac offering.  This does not suffice under Rule 9(b) . . . .").[3]

9   **IV.     EACH OF PLAINTIFFS' INDIVIDUAL CLAIMS FAIL.**

10          **A.      Plaintiffs Fail To State A Claim For "Unlawful Penalties."**

11          Plaintiffs' FAC fails to state a claim for "unlawful penalties."  Count I of the FAC fails

12  to give each defendant "fair notice" of what they are being accused of as required by Fed. R.

13  Civ. P. 8.

14          Rule 8(a)(2) requires a complaint to contain a short and plain statement that the pleader

15  is entitled to relief.  *Rasidescu v. Midland Credit Mgmt., Inc.*, 435 F. Supp. 2d 1090,

16  1099 (S.D. Cal. 2006); Fed. R. Civ. P. 8(a)(2).  It is well settled, however, that Rule 8 requires

17  "some specificity." *Twombly*, 550 U.S. 554, 127 S. Ct. at 1967.  Plaintiffs' FAC, however,

18  contains almost no specificity at all with respect to Count I, let alone the specificity required by

19  *Twombly*.  Indeed, there is no such short and plain statement, with "some specificity," as to

20  how each Defendant caused Plaintiffs an alleged injury. *Twombly*, 127 S. Ct. at 1967.

21

22  _____

23  [3] Plaintiffs' failure to plead their claims with sufficient particularity is underscored by the fact that Plaintiffs
    appear to suggest that Qwest committed fraud by failing to disclose the TLAs when Plaintiffs Vernon and Durkin
    originally purchased internet services prior to deregulation.  As described above, such a claim is barred by the

24  filed tariff doctrine – Qwest did not offer the Price for Life term contracts prior to deregulation, and any claim
    under such a contract would be contrary to the filed tariffs.  If the Plaintiffs claim that fraud occurred prior to

25  deregulation, then they must plead specifically how and when it occurred, including how such fraud could have
    occurred in light of the tariffs.  By requiring Plaintiffs to plead their claims with particularity, the true nature of
    these claims will be manifest, and the application of the filed tariff doctrine will be clear.

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 14

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1        Further, Plaintiffs' Count I, "Relief From Unlawful Penalties," is unrecognizable.  No

2    Colorado,[4] Washington, or Minnesota case has ever referenced such a cause of action, much

3    less held such a claim actionable.  In fact, no case in either federal or state court in any state

4    where Defendants provide internet service has ever even referenced such a claim as "Relief

5    From Unlawful Penalties."  A complaint must give fair notice and state the elements of the

6    claim plainly and succinctly.  *Jones v. Cmty. Redev. Agency*, 733 F.2d 646, 649 (9th Cir.

7    1984).  Here, Plaintiffs fail to state the elements of such a nebulous claim for "relief from

8    unlawful penalties."  *See id.*

9        Finally, to the extent that Plaintiffs attempt to assert a breach of contract claim, such a

10   cause of action would require damages as an essential element and lacking such damages,

11   Plaintiffs' claims fail.  Under Colorado law, "[t]he elements of a breach of contract claim are:

12   1) the existence of a contract; 2) the failure of performance; and 3) damages."  *F.D.I.C. v. First*

13   *Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1476 (D. Colo. 1996) (citing *W. Distrib.*

14   *Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992)); *see also* David K. DeWolf, Washington

15   Elements of an Action, 29 Wash. Prac., Wash. Elements of an Action § 6:1 (2008-2009 ed.)

16   (stating elements of breach of contract in Washington); 28 Minn. Prac., Elements of an Action

17   § 4:1 (same, for Minnesota).  Because Plaintiffs allege no damages, their contract claim must

18   fail.

19   **B.      Plaintiffs' Claim For Unjust Enrichment Should be Dismissed.**

20       Plaintiffs' FAC recognizes the Subscriber Agreement and seeks to invalidate various

21   terms of it, including the TLA and the arbitration clause. (Am. Compl.  ¶¶ 13, 29.)  Plaintiffs

22   cannot, however, simultaneously affirm the contract and assert a claim for unjust enrichment.

23

24   _____

25   [4] Pursuant to the Qwest Subscriber Agreement, the Parties have selected Colorado law to govern Qwest's high speed internet service, and Qwest asserts that such law should be applied.  As explained herein, however, regardless of which state's law applies, Plaintiffs' claims fail.

MOTION TO DISMISS FIRST AMENDED          08-1515 TSZ
COMPLAINT - 15

1    Unjust enrichment is an equitable theory that involves an implied contract at law when

2  the parties have no express contract.  *See Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441,

3  444 (Colo. 2000); *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258, 1261 (Wash. 2008)

4  (holding unjust enrichment "is the method of recovery for the value of the benefit retained

5  ***absent*** any contractual relationship") (emphasis added; citation omitted).    A party cannot

6  recover for unjust enrichment (quasi-contract) when the same subject matter is covered by an

7  express contract "because the express contract precludes any implied-in-law contract." *Bedard*

8  *v. Martin*, 100 P.3d 584, 592 (Colo. App. 2004) (dismissing unjust enrichment claim) (citations

9  omitted));  *Go2Net, Inc. v. FreeYellow.com*, 126 Wn.App. 769, 783, 109 P.2d. 875, 881 (Wash.

10  App. 2005) (affirming dismissal of unjust enrichment claim where contract claim was asserted

11  at same time and plaintiff had adequate remedy at law); *United States Fire Ins. Co. v. Minn.*

12  *State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief cannot be granted

13  where the rights of the parties are governed by a valid contract.") (citation omitted).

14    Courts have dismissed unjust enrichment claims where a party seeks to challenge a fee

15  assessed pursuant to the parties' contract and the same result should obtain here. *Ehreth v.*

16  *Capital One Servs., Inc.*, No. C08-0258RSL, 2008 WL 3891270, at *3 (W.D. Wash. Aug. 19,

17  2008) (dismissing unjust enrichment claim brought by plaintiff challenging late charge

18  assessed by credit card provider).  Indeed, it is well-established that a party to a contract may

19  not disregard the contract "and bring an action on an implied contract relating to the same

20  matter in contravention of the express contract." *Chandler v. Wash. Toll Bridge Auth.*,

21  17 Wn.2d 591, 604, 137 P.2d 97, 103 (Wash. 1943).

22    **C.**    **Plaintiffs Fail To State A Claim For Violation Of Consumer Protection Act Statutes.**

23    Plaintiffs fail to state a claim under the applicable consumer protection acts as well,

24  because they fail to plead the essential elements of injury or causation.

25

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 16

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1    First, Plaintiff Vernon has not paid the TLA and therefore has not been injured.   She

2    affirmatively states in the FAC that she has refused to pay the TLA.   (Am. Compl.   ¶ 23.)

3    Under both the Washington Consumer Protection Act and the Minnesota Prevention of

4    Consumer Fraud Act, injury or damage to the plaintiff is an element of the claim.   *See*

5    *Robinson v. Avis Rent A Car Sys., Inc.,* 106 Wn.App. 104, 113, 22 P.3d 818, 823 (Wash. App.

6    2001) (elements under Washington Consumer Protection Act);   *Higgins v. Harold-Chevrolet-*

7    *Geo, Inc.,* No. A04-596, 2004 WL 2660923, at *3-4 (Minn. Ct. App. Nov. 23, 2004) (elements

8    of Minnesota Prevention of Consumer Fraud Act claim).   While Plaintiffs assert that they "and

9    the other class members" have been injured "in that these ***consumers*** have lost money"   (Am.

10   Compl.   ¶ 59), Plaintiff Vernon does not identify any harm, injury, or damage that she has

11   suffered.

12   Moreover, Plaintiffs did not allege that any allegedly deceptive practice caused

13   Plaintiffs' harm.   In order to state a claim, Plaintiffs must plead "a causal link between the

14   unfair or deceptive act and the injury suffered."   *See Indoor Billboard/Washington, Inc.*,

15   162 Wn.2d 59, 74, 170 P.3d 10, 17 (Wash. 2007) (*en banc*); *see also Higgins*, 2004 WL

16   2660923, at *4 (requiring pleading that plaintiff's reliance on misrepresentation or deceptive

17   practice harmed the plaintiff).   Plaintiffs claim that "Qwest's failure to disclose the existence or

18   amount of the [TLA] before Plaintiffs . . . agree to subscribe . . . is a deceptive practice."   (Am.

19   Compl. ¶ 56.)   Plaintiffs' FAC does not, however, allege that this claimed omission caused

20   Plaintiffs' injuries.   Plaintiffs claim that they were harmed by "the invalid" TLAs   (*id.* ¶ 59), but

21   asserting that the TLAs are invalid is a challenge to the contract, not to the actual interaction

22   that took place between the Plaintiffs and Qwest before Plaintiffs signed up for the Qwest

23   service.   Plaintiffs do not, for instance, allege that but for Qwest's failure to disclose the TLAs,

24   Plaintiffs would not have signed up for Qwest's high speed internet service or would not have

25   signed up for a term agreement.   *See In re Apple & AT&TM Antitrust Litig.*, 2008 WL

MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 17

08-1515 TSZ

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   4810067, at *18 (dismissing Washington Consumer Protection Act claim where plaintiff failed

2   to allege how her behavior would have changed if the "relevant disclosures" had been made).

3   Moreover, Plaintiffs fail to plead how Qwest's alleged "threats" of TLAs could have caused

4   Plaintiffs the type of injury that is cognizable under various states consumer protection acts.

5   (Am. Compl. ¶ 59.)

6           Additionally, to the extent that Plaintiffs' consumer protection act claims rely on

7   Qwest's alleged conduct prior to deregulation, the claims must fail.  As discussed above in

8   Section I.B., prior to deregulation of internet services by the FCC in 2005 and effective in

9   2006, Qwest simply could not have offered any service or any term and condition of service

10  that deviated from the tariffs.  Qwest's internet services, including TLAs, were governed by the

11  filed tariff that had the force of law.  As a matter of law, then, Qwest cannot now be held liable

12  under any state's consumer protection act for representations or omissions it made regarding

13  the tariffed internet services.  *ICOM Holding, Inc.*, 238 F.3d at 222; *Hardy*, 86 Wn. App. at

14  492, 937 P.2d at 1131.

15          **D.      Plaintiffs Fail To State A Claim for Declaratory Judgment.**

16                  **1.      Count IV Suffers From The Same Deficiencies As Count I And**
                             **Must Be Dismissed.**

17          Similar to Count I, Plaintiffs' Count IV fails to give Defendants "fair notice" of what

18  they are respectively being accused of and should be dismissed with prejudice.  *See Rasidescu*,

19  435 F. Supp. 2d at 1099.  Plaintiffs seek a declaration that Defendants' alleged charges

20  constitute unlawful penalties, but fail to make sufficient allegations that there was a contract

21  between the parties.  In fact, Plaintiffs go to great lengths to ride the fence regarding whether

22  they actually have a contract with Defendants – never pleading definitely one scenario or the

23  other.  In fact, in the very same paragraph that Plaintiffs cite to the parties' contract they also

24  intimate no contract occurred.  (*See, e.g.*, Am. Compl.  ¶ 64 (alleging that "[w]hile the

25  Subscriber Agreement was not signed, it provided for a month-to-month arrangement. . . .  the

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   agreements between Qwest and Class members would be unenforceable . . . even if such

2   agreements occurred and could be proven.").)

3                2.    **Plaintiffs' Allegations Fail To Sufficiently Allege A Violation Of The
                       Statute Of Frauds.**

4            Plaintiffs' allegations fail to sufficiently allege a violation of applicable Statute of

5   Frauds.  For the Statute of Frauds defense to survive, there must be allegations regarding some

6   violation of the applicable Statute of Frauds.  Plaintiffs fail at this task on multiple levels.

7            First, Plaintiffs appear to be arguing in Count IV that they had an agreement and that

8   Defendants orally altered it, but as discussed above, there are no allegations to support this

9   contention.  The allegations set forth in Plaintiffs' FAC are actually in contradiction of such an

10  argument.  Plaintiffs' allegations do not detail a violation of the Statute of Frauds, but at best,

11  reveal a pure contract interpretation question.  Plaintiffs' FAC appears to allege that their

12  controlling agreement contained varying terms within it, that is, in one part a month-to-month

13  commitment, while in another part, a "term commitment."  (*See id.* ¶ 13 (detailing Subscriber

14  Agreement section 12(c) regarding a "term commitment"); ¶ 14 (detailing Subscriber

15  Agreement section 12(b) regarding a "month-to-month" commitment).)  Completely absent

16  from Plaintiffs' FAC is any semblance of the necessary elements to maintain the affirmative

17  defense of Statute of Frauds concerning an alleged oral modification.  Instead, Plaintiffs appear

18  to be attempting to create an argument that is solely dependent on the four corners of the

19  contract cited in their FAC.  (*See id.*)

20           Second, Plaintiffs do not allege that they have a contract, or an alleged contract, that

21  has a term that could not be performed within one year.  *See Appleby v. Sprint Nextel Corp.*,

22  No. 08-cv-23-JPG, 2008 WL 2130428, at *5 (S.D. Ill. May 20, 2008) (dismissing plaintiff's

23  purported declaratory judgment statute of frauds claim, in part, because "[plaintiff] does not

24  allege that the contract extensions she complains of are for services that cannot be completed

25  within a year, so as to fall within the ambit of the Statute of Frauds.").  Rather, Plaintiffs' FAC

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104

1   explicitly alleges the opposite, that is, that "[t]he only specific term of service set forth in the

2   Subscriber Agreement is a month-to-month commitment."  (Am. Compl.  ¶ 14.)

3                                    **CONCLUSION**

4           For the reasons stated above, Defendants respectfully request this Court to dismiss

5   Plaintiffs' First Amended Complaint.

6           DATED this 16th day of March, 2009.

7                                    BROWNSTEIN HYATT FARBER SCHRECK, LLP

8

9                                    By s/ Peter J. Korneffel, Jr.
                                        Timothy R. Beyer, Colo. Bar No. 12168
10                                      Peter J. Korneffel, Jr., Colo. Bar No. 19836
                                        Zhonette M. Brown, Colo. Bar No. 40011
11                                   410 17th St., Suite 2200
                                     Denver, Colorado 80202
12                                   (303) 223-1100
                                     (303) 223-1111 fax
13
                                     Timothy G. Leyh, WSBA #14853
14                                   Randall T. Thomsen, WSBA #25310
                                     DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
15
16                                   Attorneys for Defendants Qwest Communications
                                     International Inc., Qwest Services Corp., Qwest Corp.,
17                                   Qwest Communications Corp., and Qwest Broadband
                                     Services, Inc.
18

19

20

21

22

23

24

25

MOTION TO DISMISS FIRST AMENDED          08-1515 TSZ
COMPLAINT - 20

## CERTIFICATE OF SERVICE

I, Cynthia A. Smith, swear under penalty of perjury under the laws of the State of Washington to the following:

1.     I am over the age of 21 and not a party to this action.

2.     On the 16th day of March, 2009, I caused the preceding document to be served on counsel of record in the following manner:

**Counsel for Plaintiffs**

| | |
|---|---|
| Beth E. Terrell | _____ Messenger |
| Terrell Marshall & Daudt PLLC | _____ US Mail |
| 3600 Fremont Avenue North | _____ Facsimile |
| Seattle, WA 98103 | __✓__ ECF |
| bterrell@tmdlegal.com | _____ Email |
| Fax: 206-350-3528 | |

| | |
|---|---|
| Toby James Marshall | _____ Messenger |
| Terrell Marshall & Daudt PLLC | _____ US Mail |
| 3600 Fremont Avenue North | _____ Facsimile |
| Seattle, WA 98103 | __✓__ ECF |
| tmarshall@tmdlegal.com | _____ Email |
| Fax: 206-350-3528 | |

| | |
|---|---|
| Kimberlee L. Gunning | _____ Messenger |
| Law Office of Kimberlee L. Gunning, PLLC | _____ US Mail |
| 3300 East Union Street | _____ Facsimile |
| Seattle, WA 98122 | __✓__ ECF |
| kgunning@gunninglegal.com | _____ Email |
| Fax: 206-299-3818 | |

| | |
|---|---|
| Steven M. Sprenger | _____ Messenger |
| Sprenger & Lang PLLC | _____ US Mail |
| 1400 Eye Street NW, Suite 500 | _____ Facsimile |
| Washington, DC 20005 | __✓__ ECF |
| ssprenger@sprengerlang.com | _____ Email |
| Fax: 202-332-6652 | |

| | |
|---|---|
| Daniel C. Bryden | _____ Messenger |
| Sprenger & Lang PLLC | _____ US Mail |
| 310 4th Avenue South, Suite 600 | _____ Facsimile |
| Minneapolis, MN 55415 | __✓__ ECF |
| dbryden@sprengerlang.com | _____ Email |

1

Deanna D. Dailey                           _____ Messenger
Sprenger & Lang PLLC                       _____ US Mail
2   310 4th Avenue South, Suite 600        _____ Facsimile
Minneapolis, MN 55415                      ___v___ ECF
3   ddailey@sprengerlang.com               _____ Email

4

William M. Sweetnam                        _____ Messenger
5   Sprenger & Lang/Sweetnam LLC           _____ US Mail
10 South La Salle Street, Suite 3500       _____ Facsimile
6   Chicago, Illinois  60603               ___v___ ECF
wsweetnam@sprengerlang.com                 _____ Email
7   Fax:  312-606-0027

8

9                                          _Cynthia A. Smith_____
                                           Cynthia A. Smith
10

11   5408\331\1254108

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOTION TO DISMISS FIRST AMENDED          08-1515 TSZ
COMPLAINT - 22                                         LAW OFFICES
                                        DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
                                             999 THIRD AVENUE, SUITE 4400
                                             SEATTLE, WASHINGTON 98104