UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBIN VERNON, et al.,

                    Plaintiffs,                              C08-1516Z

v.                                                           ORDER

QWEST COMMUNICATIONS
INTERNATIONAL, INC., et al.,

                    Defendants.

        THIS MATTER comes before the Court on Defendants' Motion to Dismiss First

Amended Complaint, docket no. 56, and Defendants' Motion to Transfer, docket no. 58.

Having considered the pleadings and declarations filed in support of and in opposition to the

motions, the Court enters the following Order.

**I.      BACKGROUND**

        **A.      The Parties and Present Lawsuit**

        Plaintiffs Robin Vernon, a Washington resident, Rory Patrick Durkin, a Minnesota

resident, and Bryan Sandquist, a Washington resident, have filed a First Amended Complaint

("FAC"), docket no. 53, alleging a multi-state consumer class action on behalf of "[a]ll

Qwest internet service customers who, since October 15, 2002, have been subject to an Early

Termination Fee ["ETF"][1] for cancelling their internet service before the end of their alleged

---

[1] Taking all factual allegations in the complaint as true, the Court adopts Plaintiffs' "Early
Termination Fee," or "ETF," reference to the charge imposed on Plaintiffs. The Court notes that

ORDER  - 1

term commitment." FAC ¶ 36. Plaintiffs sued five corporate entities of Qwest: (1) Qwest Communications International, Inc., a Delaware corporation, (2) Qwest Services Corporation, a Colorado corporation, (3) Qwest Corporation, a Colorado corporation, (4) Quest Communications Corporation, a Delaware corporation, and (5) Qwest Broadband Services, Inc., a Delaware corporation. FAC ¶¶ 4-8. Plaintiffs allege four claims against Defendants: (1) Relief from Unlawful Penalties, FAC ¶¶ 44-48, (2) Unjust Enrichment, FAC ¶¶ 49-53, (3) Violation of Washington Consumer Protection Act ("CPA") and Other Applicable State Consumer Protection Acts, FAC ¶¶ 54-64, and (4) Declaratory Judgment Act, 28 U.S.C. § 2201, FAC ¶¶ 65-69. Among other relief sought, Plaintiffs bring this class action to enjoin Qwest from enforcing "the term commitment and ETF provisions" and to obtain damages. Id. at 15, Prayer for Relief ¶¶ E, F.

**B.    Qwest's Internet Service and the Subscriber Agreement**

Qwest[2] offers internet service to its telephone subscribers. FAC ¶ 11.[3] Customers typically order internet service from Qwest during a telephone conversation with a Qwest representative. Id. ¶ 12. After the customer orders service, Qwest sends the customer a form Subscriber Agreement that purports to govern the terms of Qwest's provision of service. Id. ¶ 13. Neither Qwest nor the customer signs the Subscriber Agreement. Id. The Subscriber Agreement states:

///

///

///

---

Defendants refer to the same charge as a "Termination Liability Assessment," or "TLA."

[2] The FAC refers to Defendants collectively as "Qwest;" Plaintiffs do not distinguish between the five corporate Qwest entities in their allegations.

[3] For the purposes of the motion to dismiss, the Court takes the allegations in the complaint as true.

ORDER  - 2

> IF YOU ORDER SERVICE(S) WITH A TERM COMMITMENT, YOU
> AGREE TO MAINTAIN THAT SERVICE(S) FOR THE ENTIRE TERM
> COMMITMENT PERIOD.

Id. (citing Subscriber Agreement at ¶ 12(c)).  The Subscriber Agreement does not contain any promise from the customer to continue the service for a prescribed term[4] or to pay an ETF if the customer does not continue the service for the entire term.  Id.  The Subscriber Agreement provides that "[t]his Agreement, together with the other agreements and policies and posted information referenced herein, constitutes the entire agreement between [the customer] and Qwest."  Id. ¶ 15 (citing Subscriber Agreement ¶ 19).

**C.    Qwest Charges the Named Plaintiffs an Early Termination Fee**

Vernon ordered Qwest internet service in approximately 2005.  FAC ¶ 18.  Durkin ordered Qwest internet service in approximately 2004, and in March 2007, he called Qwest and upgraded to "high-speed" internet service.  Id. ¶ 25.  Neither Vernon nor Durkin ever received a written contract for internet service.  Id. ¶¶ 18, 25.  In or about August 2007, Sandquist signed up for Qwest internet service over the telephone.  Id. ¶ 29.  Plaintiffs do not allege whether or not Sandquist received a written contract for internet service.  Each of these three named plaintiffs called Qwest in 2008 to cancel internet service, and Qwest charged each of them a $200 ETF.  Id. ¶¶ 19, 26-28, 30.  Vernon refused to pay the $200 ETF because neither she nor her husband agreed to pay the fee.  Id. ¶ 23.  Shortly after Vernon cancelled her Qwest internet service, she began receiving calls from a collection agency attempting to collect the $200 ETF on Qwest's behalf.  Id.  To date, Qwest continues to attempt to collect a $200 ETF from her.  Id.  In contrast to Vernon, Plaintiffs Durkin and Sandquist paid the $200 ETF under protest.  Id. ¶¶ 28, 32.

---

[4]The Subscriber Agreement provides that "Unless otherwise specified herein, Service is offered on a monthly basis . . . and automatically renews monthly."  FAC ¶ 14 (citing Subscriber Agreement ¶ 12(b)).  No other term is "specified herein."  Id.

1    **II.    DISCUSSION**

2         **A.    Defendants' Motion to Dismiss, docket no. 56**

3              **1.    Fed. R. Civ. P. 12(b)(6) Standard**

4         For purposes of a motion to dismiss, the Court must accept all factual allegations in

5    the complaint as true. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (per

6    curiam). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a

7    claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)

8    (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The U.S. Supreme

9    Court in Iqbal recently clarified the two "working principles" that underlie its prior decision

10   in Twombly: "First, the tenet that a court must accept as true all of the allegations contained

11   in a complaint is inapplicable to legal conclusions;" and "second, only a complaint that states

12   a plausible claim for relief survives a motion to dismiss." Id. at 1949-50. "Determining

13   whether a complaint states a plausible claim for relief will . . . be a context-specific task that

14   requires the reviewing court to draw on its judicial experience and common sense." Id. at

15   1950.

16              **2.    Filed Tariff Doctrine**

17        Defendants move to dismiss "any claims based on contracts formed or upon Qwest's

18   purported representations made before January 28, 2006"[5] as barred by the filed tariff

19   doctrine. Defs.' Mot. Dismiss, docket no. 56, at 2. Defendants argue that prior to January

20   28, 2006, the high-speed internet services to which Plaintiffs subscribed were governed by

21   tariffs filed with the Federal Communications Commission ("FCC"); that Qwest could only

22   offer internet service in accordance with the filed tariffs during that period; and that the

23   mandatory federal tariff filings bar any claim or liability that arose prior to the deregulation

24   of the high-speed internet services market.

25

26   _____

[5] It is not clear which specific claims Defendants are moving to dismiss.

ORDER  - 4

Plaintiffs urge the Court not to consider the material extrinsic to the complaint that Defendants have filed in support of their motion to dismiss.  See, e.g., Beach Decl., docket no. 57, Exs. H, I (Tariff F.C.C. No. 1); see Lee v. City of Los Angeles, 250 F.3d 668, 688-90 (9th Cir. 2001).  The Court will not consider the extrinsic materials.[6]

The Court deems Defendants' motion to dismiss as being maintained only against the named plaintiffs because the class is not yet certified.  See Aguilera v. Pirelli Armstrong Tire Corp., 223 F.3d 1010, 1013 n.1 (9th Cir. 2000) ("When a motion is maintained against an uncertified class, only the named plaintiffs are affected by the ruling.").  Even if the Court assumes for the purposes of this motion that the filed tariff doctrine bars claims based on contracts that arose prior to January 28, 2006, which the parties hotly dispute, none of the named plaintiffs' claims arose prior to January 28, 2006.  Even though Vernon and Durkin ordered Qwest internet service prior to January 28, 2006, in contrast to Sandquist who ordered it in August 2007, all of the named plaintiffs' claims arose in 2008 when Qwest charged them with the ETF for cancelling service.  At that point or later is when Qwest imposed an allegedly unlawful penalty; when Qwest was allegedly unjustly enriched; when the named plaintiffs allegedly suffered injury necessary to support a claim under state consumer protection acts; and when an actual case or controversy existed to support a declaratory judgment claim.  The Court DENIES Defendants' motion to dismiss the named plaintiffs' claims based on the filed tariff doctrine because their claims arose after January 28, 2006.[7]

---

[6] While the Court might take judicial notice of a filed tariff, the Court will not assume the submitted documents contain the applicable filed rates.  In addition, for the reasons stated in this Order, the Court would reach the same conclusion even if the Court took judicial notice of the filed tariffs.  The filed rates have no application to the named plaintiffs' claims, the only claims before the Court on the Rule 12(b)(6) motion.

[7] The claims of some members of the putative class could theoretically have arisen prior to the January 28, 2006 deregulation of Qwest's high-speed internet service contracts because Plaintiffs have defined the class as including Qwest customers who have been subject to an ETF since October 15, 2002.  However, the Court does not reach the issue of whether the filed tariff doctrine precludes claims of members of the putative class whose claims arose prior to January

## 2. <u>Standing</u>

A plaintiff has standing only if he can show that he has suffered an injury in fact that is fairly traceable to the challenged action of the defendant and which will likely, not merely speculatively, be redressed by a favorable decision. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

Defendants argue that Plaintiffs lack standing on two distinct grounds.[8] First, Defendants argue that Plaintiffs have failed to allege sufficiently that they have been injured by a particular Defendant's alleged conduct. In other words, Plaintiffs have not specifically shown which of the five corporate Qwest entities is responsible for causing their injuries. Defendants rely on <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1001 n.13 (1982), for the proposition that "[a] complaint must allege facts showing that a plaintiff has standing as to each defendant." Defs.' Mot. Dismiss at 9. <u>Blum</u> does not stand for this proposition. Rather, <u>Blum</u> requires class representatives to allege that they have been personally injured and conversely prohibits them from alleging that injury has been suffered only by unidentified members of the class. See <u>Blum</u>, 457 U.S. at 1001 n.13. Plaintiffs in this case are not attempting to establish the injury element of standing by pointing to alleged injury of unidentified members of the class; rather, they have alleged that they have been personally injured by Qwest's imposition of the ETF. Defendants have provided no authority that would require a plaintiff to establish standing by alleging that he or she has been injured by each and every corporate defendant when affiliated corporate defendants are sued.

At least one court has expressly rejected the argument put forth here by Defendants, i.e., that a plaintiff must ascertain, prior to conducting discovery, the names and corporate

---

28, 2006. That issue may more appropriately be addressed in connection with a motion for class certification or a motion for summary judgment.

[8] Although Defendants do not specifically refer to the Court's jurisdiction or refer to this portion of the motion as one to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), standing is a jurisdictional issue.

affiliations of telephone representatives with whom he or she had only a brief exchange. See Bechtold v. Sprint Nextel Corp., No. 08-cv-23-JPG, 2008 U.S. Dist. LEXIS 88207, at **8-10 (S.D. Ill. Oct. 30, 2008). In Bechtold, the Court allowed the plaintiff to sue nine corporate entitites of Sprint and rejected the argument that the plaintiff lacked standing by bringing his allegations against the Sprint Defendants as a group. Id. "Whether Bechtold will be able to prove . . . that the Sprint representatives he dealt with were agents of all, some, one, or none of the Defendants is a matter for another day." Id. at *10. "[E]ven if Bechtold is unable to prove his claims, such an eventuality would not mean that he lacked standing to bring them." Id. Here, Plaintiffs will need to conduct discovery to ascertain the proper Qwest Defendant(s).[9] The Court finds Bechtold persuasive and denies Defendants' motion to dismiss for lack of standing on this basis.[10]

Second, Defendants argue that Plaintiffs lack standing to assert claims under the consumer protection act statutes of states in which Plaintiffs do not reside. The three named plaintiffs are residents of Washington and Minnesota, but they purport to assert claims under consumer protection acts of twelve other states. FAC ¶¶ 54-64 (alleging violations of the "Washington Consumer Protection Act and Other Applicable State Consumer Protection Acts.").[11] Plaintiffs argue, and the Court agrees, that the standing issue is not ripe at this time because the class certification issue is logically antecedent to the standing issue. See Jepson v. Ticor Title Ins. Co., No. C06-1723-JCC, 2007 WL 2060856, *1 (W.D. Wash. May 1,

---

[9] Defendants have not identified with certainty the proper Qwest Defendant. Compare Leo Decl. ¶ 3 ("Qwest's broadband services are part of Defendant Qwest Corporation"); Leo Decl. Ex. B (Subscriber Agreement) ¶ 1 ("'Qwest' means the affiliate of Qwest Services Corporation that provides you the Service . . . ") and ¶ 2 ("Qwest Corporation ('QC') and/or Qwest Broadband Services, Inc. will provide . . . the Service").

[10] Defendants apparently found Bechtold persuasive too as they, in their reply brief, abandoned their argument that Plaintiffs lack standing because Plaintiffs failed to allege injury as to each and every Qwest Defendant. See Defs.' Reply to Mot. Dismiss, docket no. 63, at 7-8.

[11] Qwest offers high-speed internet services in fourteen states – i.e., Arizona, Colorado, Iowa, Idaho, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming. Leo Decl., docket no. 59, ¶ 6.

ORDER  - 7

2007).  Defendants have not challenged Plaintiffs' assertion that, as in <u>Jepson</u>, "there is no question that the proposed class would have standing to assert non-Washington claims if it were certified."  <u>See</u> <u>Jepson</u> at *1.  To require Plaintiffs to add a plaintiff from each state in Qwest's service area in order to survive a motion to dismiss would be inefficient and contrary to the purposes of Rule 23 of the Federal Rules of Civil Procedure.  The Court rejects Defendants' argument that a motion for class certification needs to be pending to justify the Court's deferral of the Article III standing issue.  The standing concerns would not exist but for the class action nature of the case.  The Court denies without prejudice Defendants' motion to dismiss Plaintiffs' non-Washington and non-Minnesotan consumer protection act claims for lack of standing.[12]

### 3. <u>Heightened Pleading Standard for Fraud Claims</u>

Defendants move to dismiss Plaintiffs' unjust enrichment claim (Count II) and their consumer protection act claim (Count III) by arguing that these claims "sound in fraud" and do not meet the heightened pleading standard for fraud claims set forth in Rule 9(b) of the Federal Rules of Civil Procedure.  <u>See</u> <u>Vess v. Ciba-Geigy Corp.</u>, 317 F.3d 1097, 1107 (9th Cir. 2003) ("A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim.").  In contrast to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a claim for relief contain " a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 9(b) requires that a "fraud or mistake" claim "state with particularity the circumstances constituting fraud."  Plaintiffs argue that their unjust enrichment and consumer protection act claims are not subject to Rule 9(b), and that, even if it applies, their pleading satisfies Rule 9(b).

---

[12] In making this ruling, the Court does not reach Plaintiffs' argument that non-residents of Washington may invoke the Washington Consumer Protection Act.  <u>See</u> Pls.' Opp'n to Mot. Dismiss, docket no. 62, at 11-12.

Notwithstanding the fact that Plaintiffs have not plead a common law fraud claim, Rule 9(b) applies where a claim is based on "a unified course of fraudulent conduct," even if the word "fraud" is not used. See Vess, 317 F.3d at 1103-05. Here, Defendants argue that Plaintiffs' unjust enrichment and consumer protection act claims are based on an alleged unified course of fraudulent conduct in which Qwest made material omissions and misrepresentations to all of its high-speed internet customers; Qwest knew of the statements' falsity; Qwest had the intent to induce customers to buy or continue Qwest's service; and Qwest's customers relied on those misrepresentations to their detriment. Defs.' Mot. Dismiss at 10-11. While Plaintiffs admit that they allege that Qwest's omissions and misrepresentations about the existence and amount of the ETF "have the tendency or capacity to mislead consumers," FAC ¶ 60, Plaintiffs contend such allegations do not amount to common law fraud[13] and do not trigger Rule 9(b) in the absence of allegations of either an intent to deceive or an overarching fraudulent scheme. See In re Mattel, Inc., 588 F. Supp. 2d 1111 (C.D. Cal. 2008) (allegations of likely deception are not enough to trigger Rule 9(b)). The Court rejects Defendants' argument that Plaintiffs have alleged an intent to deceive. The allegations cited by Defendants assert that through the imposition of an ETF, Qwest intended to discourage customers from canceling Qwest service and increase revenues, but not that Qwest intended to deceive customers. See Defs.' Reply to Mot. Dismiss at 8 (citing FAC ¶¶ 2, 17, 51).

Rule 9(b) can also apply where fraud is an essential element of a claim or where Plaintiffs allege some fraudulent and some non-fraudulent conduct. See Vess, 317 F.3d at 1103-05. Fraud is not an essential element of Plaintiffs' unjust enrichment or consumer

---

[13] Under Washington law, "[t]he nine elements of fraud are: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." Stiley v. Block, 130 Wn.2d 486, 505 (Wash. 1996).

protection act claims under Washington or Minnesota law because Plaintiffs have not alleged

facts that constitute fraud and the gravamen of the complaint is not fraud.  See Bailie

Commc'ns, Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App. 151, 159-60 (Wash. App. 1991)

(listing elements of unjust enrichment); Acton Constr. Co. v. State, 383 N.W.2d 416, 417

(Minn. Ct. App. 1986) (same); Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.

Co., 105 Wn.2d 778, 780, 785 (Wash. 1986) (listing elements of Washington CPA); cf.

Fidelity Mortgage Corp. v. Seattle Times Co., 213 F.R.D. 573 (W.D. Wash. 2003) (applying

heightened pleading standard because plaintiff's Washington CPA claim "mirrors the

elements of an action for fraud"); Tuttle v. Lorillard Tobacco Co., 118 F. Supp. 2d 954, 963

(D. Minn. 2000) (applying heightened pleading standard to Minnesota consumer fraud

statutory claim because "the gravamen of the complaint is fraud").  Plaintiffs concede that

fraud is one of the many possible unfair or deceptive acts for which a consumer may seek

relief under consumer protection statutes, but they have not alleged fraud as an element of

their consumer protection act claims.

Having carefully reviewed Plaintiff's First Amended Complaint, the Court concludes

that Rule 9(b) does not apply to Plaintiffs' unjust enrichment and consumer protection act

claims.[14]

### 4.    Failure to State a Claim for Unlawful Penalties

Defendants move to dismiss Plaintiffs' "Relief from Unlawful Penalties" claim (Count

I), FAC ¶¶ 44-48, for three reasons: (1) the claim fails to give each Defendant fair notice of

what they are being accused of as required by Rule 8 of the Federal Rules of Civil Procedure;

(2) the claim is not a legally cognizable claim; and (3) Plaintiffs have not alleged damages.

---

[14] The Court does not reach the issue of whether the consumer protection acts of states other than
Washington or Minnesota require the pleading to satisfy Rule 9(b), nor does the Court reach the
issue of whether Plaintiffs' unjust enrichment and consumer protection act claims satisfy Rule
9(b).

Before determining if Rule 8 has been met or damages properly plead, the Court must determine whether Plaintiffs have plead a legally cognizable claim. Defendants argue that no court in any of the fourteen states in which Defendants provide internet service has ever referenced such a cause of action.[15] Plaintiffs respond every state in Qwest's fourteen-state service area recognizes that a purported liquidated damages clause that operates as a penalty is not enforceable. While this may be true, Plaintiffs have not alleged the existence of a contract, let alone a liquidated damages clause in such a contract. The cases relied upon by Plaintiffs seem to require such allegations. See, e.g., Klinger v. Adams County School Dist. No. 50, 130 P.3d 1027, 1033-34 (Colo. 2006) (determining whether a contract provision for liquidated damages is invalid as a penalty, i.e., whether it is unreasonably large for the expected loss from a breach of contract); Watson v. Ingram, 124 Wn.2d 845, 850 (Wash. 1994) (determining whether the parties' contract provision in a real estate purchase and sale agreement requiring plaintiff to forfeit a $15,000 nonrefundable earnest money deposit is enforceable as liquidated damages or, alternatively, amounts to an unlawful penalty). The Court agrees with Defendants that Plaintiffs have failed to state the elements of a legally cognizable claim.[16] The Court GRANTS Defendants' motion to dismiss Plaintiff's Relief from Unlawful Penalties claim (Count I) and DISMISSES with prejudice Count I.

## 5. Failure to State a Claim for Unjust Enrichment

Defendants argue that Plaintiffs' unjust enrichment claim (Count II) cannot stand in the face of an express contract between the parties (i.e., the Subscriber Agreement). Unjust

---

[15] Defendants maintain that Colorado law should be applied pursuant to the terms of the Subscriber Agreement. The Court does not reach the issue of which state's law should be applied to Plaintiff's Count I because Defendants argue that regardless of which state's law applies, Plaintiffs' Count I fails.

[16] Plaintiffs have also failed to explain how Count I differs from Count IV for Declaratory Judgment, in which Plaintiffs "seek a declaration that . . . any purported ETFs are unenforceable because . . . they constitute unlawful penalties." FAC ¶ 69.

enrichment is an equitable theory that "invokes an implied contract when the parties either have no express contract or have abrogated it." Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 444 (Colo. 2000) (en banc); see also Young v. Young, 164 Wn.2d 477, 484 (Wash. 2008) ("Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it."). Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because Plaintiffs are simultaneously alleging that their rights are governed by an express contract, i.e., the Subscriber Agreement.

This argument fails for four reasons. First, Plaintiffs have not alleged a separate breach of contract claim.[17] Second, even if they had, Rule 8(d)(2) of the Federal Rules of Civil Procedure allows parties to plead in the alternative:

> A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

Fed. R. Civ. P. 8(d)(2). Third, cases in which courts have dismissed an unjust enrichment claim at the summary judgment stage cannot be relied upon for the proposition that an unjust enrichment claim should be dismissed at the pleading stage on a motion to dismiss. See Go2Net, Inc. v. FreeYellow.com, Inc., 126 Wn. App. 769 (Wash. App. 2005) (upholding summary judgment dismissal of unjust enrichment claim where breach of contract claim provided adequate remedy at law); Bedard v. Martin, 100 P.3d 584, 591-92 (Colo. App. 2004) (upholding summary judgment dismissal of unjust enrichment claim where it was undisputed that the parties entered into a contract governing the terms of the dispute).

Lastly, the mere existence of a contract does not automatically invalidate an unjust enrichment claim. A claim for unjust enrichment may survive a motion to dismiss if a

---

[17] Plaintiffs reject Defendants' attempt to recast Plaintiffs' Count I as a breach of contract claim. Pls.' Opp'n to Mot. Dismiss at 17.

plaintiff challenges the validity of the contract. <u>Cf.</u> <u>Ehreth v. Capital One Servs., Inc.</u>, No. C08-0258-RSL, 2008 WL 3891270, at *3 (W.D. Wash. Aug. 19, 2008) (dismissing unjust enrichment claim where the plaintiff did not argue that the contract was unenforceable); <u>Chandler v. Wash. Toll Bridge Auth.</u>, 17 Wn.2d 591, 604 (Wash. 1943) ("A party to a *valid* express contract . . . may not . . . bring an action on an implied contract relating to the same matter, in contravention of the express contract.") (emphasis added); <u>United States Fire Ins. Co. v. Minnesota State Zoological Bd.</u>, 307 N.W.2d 490, 497 (Minn. 1981) (upholding dismissal of unjust enrichment claim on motion for judgment on the pleadings after holding that the rights of the parties were governed by a *valid* contract). In the present case, Plaintiffs challenge the validity of any contract term – oral or written – that imposes an ETF. FAC ¶ 46 ("Unlawful penalties such as Qwest's ETF . . . are void and unenforceable."); <u>see</u> <u>also</u> FAC ¶ 69 ("[A]ny purported ETFs are unenforceable because Plaintiffs and the Class never agreed to them, they are unconscionable, they constitute unlawful penalties, and they are unenforceable under the Statute of Frauds."). In contrast to <u>United States Fire Insurance Company</u>, there has been no holding in the present case that a *valid* contract between the parties governs the ETFs charged by Defendants. In their reply brief, Defendants fail to address Plaintiffs' responsive arguments. <u>See</u> <u>generally</u> Defs.' Reply to Mot. Dismiss at 10-11. Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiffs' unjust enrichment claim (Count II) as a result of the existence of the Subscriber Agreement.[18]

---

[18] Defendants assert for the first time in their reply brief that Plaintiff Vernon's unjust enrichment claim should be dismissed because she has not paid an ETF and therefore cannot plead the first element of unjust enrichment, i.e., that she has conferred a benefit on Defendants. <u>See</u> <u>Bailie</u>, 61 Wn. App. at 159-60. Notwithstanding the fact that Defendants failed to raise the issue in their opening motion, Plaintiffs' opposition brief argues that Vernon has suffered "injury" sufficient to support an unjust enrichment claim. Pls.' Opp'n to Mot. Dismiss at 18:9-19. Injury to plaintiff, however, is not the first element of unjust enrichment. With respect to the first element, Plaintiffs have alleged that "Benefits were conferred on Qwest when payments for invalid ETFs were obtained from Plaintiffs and the other Class members," FAC ¶ 50, but this allegation does not apply to Vernon since Qwest never obtained an ETF payment from her. The Court GRANTS Defendants' motion to dismiss Vernon's unjust enrichment claim (Count II as to Vernon) and DISMISSES without prejudice Count II as to Vernon.

## 6. **Failure to State a Claim under State Consumer Protection Acts**

Defendants move to dismiss Vernon's Consumer Protection Act claim for failure to allege the fourth "injury to plaintiff in his or her business or property" element of the claim. See Hangman Ridge, 105 Wn.2d at 780.[19] Defendants base their "no injury" argument on Vernon's allegation that she has refused to pay the $200 ETF. FAC ¶ 23. In the section of the FAC setting forth Plaintiffs' consumer protection act claim, Plaintiffs allege that "Qwest's conduct has injured the property of Plaintiffs and the other Class members, in that these consumers have lost money as a result of Qwest's invalid ETFs and threat of ETFs." FAC ¶ 63. In opposition to Defendants' motion to dismiss, Plaintiffs argue that monetary loss is not the only way to satisfy the injury requirement. Even if true, Plaintiffs have failed to allege any loss other than monetary loss. Plaintiffs argue that they have alleged "nonquantifiable injuries, including receipt of collection notices and harm to credit," Pl.'s Opp'n to Mot. Dismiss at 22 (citing FAC ¶¶ 23, 32); however, only FAC ¶ 23 applies to Vernon, and FAC ¶ 23 merely alleges that Qwest has attempted to collect the $200 ETF from Vernon, not that she has been injured as a result of such collection efforts. The Court GRANTS Defendants' motion to dismiss Vernon's Washington CPA claim (Count III as to Vernon) and DISMISSES without prejudice Count III as to Vernon.

Defendants also move to dismiss Plaintiffs' consumer protection act claim(s) by arguing that Plaintiffs have failed to allege causation, i.e., that any deceptive or unfair practice caused Plaintiffs' harm. See Hangman Ridge, 105 Wn.2d at 785, 793 (requiring a causal link between the unfair or deceptive act complained of and the injury suffered for Washington CPA claim); Higgins v. Harold-Chevrolet-Geo, Inc., No. A04-596, 2004 WL 2660923, at *2 (Minn. Ct. App. Nov. 23, 2004) (requiring "a causal nexus . . . between [] damages and the alleged wrongful conduct complained of" under the Minnesota Prevention

---

[19] Vernon, a Washington resident, presumably asserts her claim under the Washington Consumer Protection Act.

ORDER - 14

of Consumer Fraud Act claim).[20]  Plaintiffs have alleged that Qwest failed to disclose the existence or amount of the ETF before Plaintiffs agreed to subscribe to its internet service, FAC ¶ 60, and that "Qwest's conduct has injured the property of Plaintiffs . . . in that these consumers have lost money as a result of Qwest's invalid ETFs and threats of ETFs."  FAC ¶ 63.

Plaintiffs' allegations are sufficient under current Washington law governing the causation element of a Washington CPA claim.  Washington courts do not require a plaintiff to allege individual reliance on Defendants' conduct, particularly where the non-disclosure of a material fact is alleged.  See Schnall v. AT & T Wireless Servs., Inc., 139 Wn. App. 280, 289-292 (Wash. App. 2007) (review granted, 163 Wn.2d 1022 (Wash. 2008)) (causation under Washington CPA could be satisfied by means other than reliance).  However, Plaintiffs' failure to allege reliance on Defendants' omissions or misrepresentations appears fatal under Minnesota law.  See Higgins, at *4 ("As a practical matter it is not possible that the damages could be caused by a violation without reliance on the statements or conduct alleged to violate the statutes.").  Plaintiffs do not address Defendants' motion under the Minnesota Prevention of Consumer Fraud Act.  Accordingly, the Court GRANTS IN PART Defendants' motion to dismiss Plaintiffs' consumer protection act claims, and DISMISSES without prejudice Plaintiffs' claim under the Minnesota Prevention of Consumer Fraud Act (Count III as to Durkin, a Minnesota resident).

### 7.     Failure to State a Claim for Declaratory Judgment

Defendants move to dismiss Plaintiffs' Declaratory Judgment Act claim (Count IV) by arguing that Plaintiffs have failed to give Defendants "fair notice" of the accusations against them.  Specifically, Defendants challenge Plaintiffs' failure to make sufficient allegations that there was a contract between the parties.  Plaintiffs respond that this matter is

_____

[20] Defendants have cited only Washington and Minnesota law in support of their motion to dismiss Plaintiffs' consumer protection act claims.  Accordingly, the Court restricts its analysis to these states.

well-suited to the Declaratory Judgment Act, 28 U.S.C. § 2201, precisely because there are conflicting views among the parties regarding the existence of and respective rights under a contract.

The Declaratory Judgment Act provides, in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . .

28 U.S.C. § 2201(a). As part of their Declaratory Judgment Act claim, Plaintiffs allege that the unsigned Subscriber Agreement provided for a month-to-month arrangement, and that the month-to-month term may not be varied by purported oral agreements to term commitments of two years or more. FAC ¶ 48. "Plaintiffs seek a declaration that any purported term commitments of longer than month-to-month and any purported ETFs are unenforceable because Plaintiffs and the Class never agreed to them, they are unconscionable, they constitute unlawful penalties, and they are unenforceable under the Statute of Frauds." FAC ¶ 69. These allegations give sufficient notice of Plaintiffs' accusations and the relief requested.

Defendants also move to dismiss Plaintiffs' Declaratory Judgment Act claim by arguing that Plaintiffs have failed to adequately allege a violation of the Statute of Frauds. Plaintiffs adequately allege that any oral agreement that Defendants rely on to establish a term commitment in excess of one year is unenforceable under the Statute of Frauds. FAC ¶ 68. The Court DENIES Defendants' motion to dismiss Plaintiffs' Declaratory Judgment Act claim.

**8.      Conclusion Re: Defendants' Motion to Dismiss**

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss First Amended Complaint, docket no. 56. The Court GRANTS IN PART Defendants' motion to dismiss and DISMISSES with prejudice Plaintiffs' Relief from

Unlawful Penalties claim (Count I).  The Court DISMISSES without prejudice Vernon's

unjust enrichment claim (Count II as to Vernon), Vernon's Washington CPA claim (Count

III as to Vernon), and Durkin's claim under the Minnesota Prevention of Consumer Fraud

Act (Count III as to Durkin).  The Court DENIES IN PART Defendants' motion to dismiss

and declines to dismiss Durkin or Sandquist's unjust enrichment claims, Sandquist's

Washington CPA claim, and Plaintiffs' Declaratory Judgment Act claim, for the reasons

outlined herein.

### B.    Defendants' Motion to Transfer, docket no. 58

Defendants move to transfer the case to Colorado pursuant to 28 U.S.C. § 1404(a)

("Section 1404(a)"), which provides: "For the convenience of parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought."  Here, it is undisputed that Plaintiffs' suit "might have

been brought" in the District of Colorado.  Thus, the issue before the Court is whether the

Court should exercise its discretion to transfer the case for the convenience of the parties and

witnesses, and in the interest of justice.  See Jones v. GNC Franchising, Inc., 211 F.3d 495,

498 (9th Cir. 2000) (calling for "an individualized, case-by-case consideration of

convenience and fairness").

Under Section 1404(a), a court may consider the following factors in its

determination of whether transfer is appropriate: (1) the location where the relevant

agreements were negotiated and executed, (2) the state that is most familiar with the

governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the

forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the

differences in the costs of litigation in the two forums, (7) the availability of compulsory

process to compel attendance of unwilling non-party witnesses, (8) the ease of access to

sources of proof, (9) the presence of a forum selection clause, and (10) the relevant public

policy of the forum state, if any.  Id. at 498-99.

1          **1.    Location where Relevant Agreements Negotiated and Executed**

2          Plaintiffs cite extensively to a form "Subscriber Agreement" in their First Amended

3    Complaint.  See, e.g., FAC ¶¶ 13-15, 33-35, 38, 68, Prayer for Relief ¶ E.  The Subscriber

4    Agreement was drafted in Colorado.  Leo Decl. ¶ 17.  Plaintiffs argue that the location of the

5    drafting of the Subscriber Agreement should not be considered by the Court because the

6    Subscriber Agreement is a contract of adhesion that was neither negotiated nor executed by

7    any of Qwest's internet customers.  Pls.' Opp'n to Mot. Transfer, docket no. 61, at 5.

8    Because the Subscriber Agreement is clearly a relevant agreement in this case, put squarely

9    at issue by Plaintiffs in their FAC, the Court considers the Colorado location of its drafting in

10   the transfer analysis.

11         Any oral agreements entered into between Defendants' customers and Defendants that

12   were reached over the telephone, see FAC ¶¶ 12, 19-20, 22, 25-26, 29-31, Leo Decl. ¶ 18,

13   have no one particular location where they were negotiated and executed.  The customers

14   reside in different states and Qwest maintains call centers, which accept calls from customers

15   seeking to purchase high-speed internet services, in Colorado, Utah, Idaho, Oregon, North

16   Dakota, South Dakota, Nebraska, Iowa, Arizona, New Mexico, Minnesota and Washington;

17   however, no *sales* call centers are located in Washington.  Leo Decl. ¶ 12.  The location of

18   any oral agreements reached over the telephone is neutral to the transfer analysis.

19         **2.    State Most Familiar with Governing Law**

20         The question of which state's law governs only applies to Plaintiffs' challenge to the

21   enforceability of the arbitration and class action waiver provisions of the Subscriber

22   Agreement (FAC ¶¶ 33-35) and Plaintiffs' unjust enrichment claim (Count II) (FAC ¶¶ 49-

23   53), because the Court dismissed Plaintiffs' Relief from Unlawful Penalties claim (Count I);

24   Count III is brought pursuant to multiple state consumer protection acts, including both

25   Washington and Colorado statutes; and Count IV is brought pursuant to the federal

26   Declaratory Judgment Act.

The parties dispute which state's laws govern the present dispute. Plaintiffs argue that Washington law governs the dispute, whereas Defendants argue that Colorado law governs the dispute pursuant to the choice of law provision of the Subscriber Agreement. Leo Decl., Ex. B (Subscriber Agreement) at 12, ¶ 17(a)(i). Plaintiffs argue that such choice of law provision is unenforceable, for lack of mutual assent, and only applies to claims that are arbitrated. Pls.' Opp'n to Mot. Transfer at 5-9. Defendants, in their reply, urge the Court to conduct a full choice of law analysis and to determine that Colorado law applies. See Defs.' Reply to Mot. Transfer, docket no. 64, at 2-6. The Court declines to conduct a choice of law analysis as part of its transfer analysis, given that the issues were not raised in Defendants' opening motion, and the result of such analysis is not necessary to the transfer analysis. Whether the case is transferred or not, Washington choice of law rules will be applied to determine the applicable state law. See Van Dusen v. Barrack, 376 U.S. 612, 639 (1964) (rejecting the plaintiffs' contention that the transfer was necessarily precluded by the likelihood that a prejudicial change of law would result). Courts in both forums are equally equipped to apply these rules to determine which state's laws govern Plaintiffs' claims and to apply that law. The Court considers this "governing law" factor neutral in its transfer analysis.

### 3.    Plaintiffs' Choice of Forum

"Although great weight is generally accorded plaintiff's choice of forum, when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987) (internal citation omitted) (derivative suit); see also Italian Colors Restaurant v. Am. Express Co., No. C 03-3719 SI, 2003 WL 22682482, at *3 (N.D. Cal. Nov. 10, 2003) (nationwide class). "[W]here there are hundreds of potential plaintiffs, . . . all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is

appropriate merely because it is his home forum is considerably weakened." <u>Koster v. (American) Lumbermens Mut. Cas. Co.</u>, 330 U.S. 518, 524 (1947) (derivative suit).

Plaintiffs have alleged a multi-state class action lawsuit across fourteen states. That two of the three named plaintiffs – i.e., Vernon and Sandquist – call Washington home is given little weight in the Court's transfer analysis because what is convenient for them is not necessarily convenient for Durkin or other non-Washington members of the putative class. Plaintiffs have alleged that "Plaintiffs' claims, like the claims of the class, arise out of the same common course of conduct by Qwest." FAC ¶ 39. Interchangeable plaintiffs could be found in any district in which Defendants offer their internet services, including the District of Colorado. Although Vernon and Sandquist are residents of Washington, their contacts with Washington are "no more forceful than the link between the thousands of potential class members and their respective districts." <u>See Italian Colors Restaurant</u> at *4. Plaintiffs' reliance on a Title VII class action case is misplaced. <u>See Ellis v. Costco Wholesale Corp.</u>, 372 F. Supp. 2d 530, 544 (N.D. Cal. 2005) ("a plaintiff's choice of forum is entitled to greater deference where a case arises under Title VII"). This "plaintiff's choice of forum" factor weighs only slightly in favor of Washington.

### 4. **Respective Parties' Contacts with Forum**

Defendants concede that "Qwest [Corporation] does business in the Western District of Washington" and offers high-speed internet service to customers here. Leo Decl. ¶¶ 5-6. But Qwest also offers high-speed internet service to customers in Colorado. <u>Id.</u> ¶ 6. That two of three named Plaintiffs are Washington residents weighs in favor of Washington, but only slightly because of the multi-state class action nature of the dispute, the type of claims alleged, and the fact that Defendants are headquartered in Colorado and have more offices in Colorado than in any other state. Leo Decl. ¶ 4.

## 5. Contacts Relating to Plaintiffs' Cause of Action in Chosen Forum

It is undisputed that Durkin, a Minnesota resident, has no contacts relating to the claims in Washington. Plaintiffs assert that Vernon and Sandquist have the following contacts relating to their claims in Washington:

> As Washington residents, they [Vernon and Sandquist] received Qwest's internet service in this forum, Qwest offered them internet service in this forum, and they were subjected to Qwest's unlawful termination fee in this forum. Moreover, they suffered the injury arising from Qwest's wrongdoing in this forum.

Pls.' Opp'n to Mot. Transfer at 10. This contention is not consistent with Plaintiffs' FAC as it regards Sandquist. FAC ¶¶ 29-32 (alleging that Sandquist signed up for Qwest internet service in August 2007 when he resided in *Portland, Oregon*; alleging that he called to cancel his service in December 2008 *because he was moving to Tacoma, Washington*; alleging that he thereafter paid the $200 ETF under protest). Plaintiffs' allegations are silent as to Sandquist's residency at the time he paid the ETF. The FAC raises serious questions whether Sandquist has *any* contacts relating to his claims in Washington. In contrast to Sandquist, nothing in Plaintiffs' allegations refute the contention that Vernon was a Washington resident when she signed up for, received, and cancelled Qwest internet service. See generally FAC ¶¶ 18-23. However, because Vernon's Counts II and III have been dismissed, albeit without prejudice, her contacts with Washington only slightly favor Washington as a forum for this lawsuit.

## 6. Differences in Costs of Litigation in Two Forums

Litigation costs will be substantially lower in Colorado because the vast majority of witnesses and documents relevant to Plaintiffs' claims are located in Colorado. The principal place of business for all five Defendants is Denver, Colorado. FAC ¶¶ 4-8; Leo Decl., docket no. 59, ¶ 3 (Qwest Corporation); Leo Decl. Ex. A (Form 10-K for Qwest Communications International, Inc.) at 1-2 (Part I, Item 1). Substantially all of the broadband product group, which develops and manages Qwest's high-speed internet service,

ORDER - 21

is located in Denver, Colorado.  Leo Decl. ¶ 11.  The majority of persons involved in developing Qwest's ETF reside in Colorado.  Id.  Qwest maintains sales call centers in Colorado, but not in Washington.  Id. ¶ 12.  The majority of computers that store Qwest's customer records are located in Colorado (or Nebraska).  Id. ¶ 14.  Policy decisions regarding consumer sales, communications with customers, pricing and billing related to high-speed internet are made and approved in Colorado.  Id. ¶ 15.  Qwest's advertising and marketing departments are located in Colorado, and Qwest spends the most money advertising its internet services in Colorado.  Id. ¶ 16.  The Subscriber Agreement was drafted in Colorado.  Id. ¶ 17.  Undoubtedly, Denver, Colorado is the primary location from which defense witnesses will be drawn.  See Defs.' Reply to Mot. Transfer, Ex. K (Defendants' Rule 26(a)(1) Disclosures) at 2-4 (listing many Qwest employees as likely witnesses).

Plaintiffs have not provided any argument or evidence that their witnesses will primarily come from Washington.  It is likely that Plaintiffs' witnesses will be customers from all fourteen states in which Qwest offers internet service.  Plaintiffs argue that Qwest cannot claim inconvenience because "Qwest is an enormous company with tremendous financial resources that dominates local phone service in Washington."  Pls.' Opp'n to Mot. Transfer at 11.  While Qwest could reasonably expect to defend a suit in Washington as a result of its extensive contacts with Washington, that is not the inquiry for a motion to transfer based on the convenience and fairness of the parties.  The Court finds that the litigation will be substantially less expensive in Colorado as a result of the witnesses and documents located there.  This "litigation costs" factor weighs heavily in favor of Colorado.

### 7.  **Availability of Compulsory Process Re: Non-Party Witnesses**

Most witnesses will be located in Colorado and be associated with Qwest's corporate operations there.  Any former Qwest employees more likely will be located in Colorado than in Washington.  There is no evidence to suggest that compulsory process will be necessary in Washington.  This "compulsory process" factor is neutral or slightly favors Colorado.

1

**8.**     **Ease of Access to Sources of Proof**

2       For the same reasons outlined in Section #6 above with respect to litigation costs, the

3 "ease of access to proof" factor weighs heavily in favor of Colorado.

4

**9.**     **Presence of a Forum Selection Clause**

5       Neither party has mentioned the presence of a forum selection clause in any relevant

6 agreement. This factor is neutral to the Court's transfer analysis.

7

**10.**     **Relevant Public Policy of Forum State**

8       Plaintiffs argue that Washington's public policy of "protecting consumers from

9 corporate malfeasance," would not be served by transferring the action brought in part on

10 behalf of Washington consumers to Colorado. Pls.' Opp'n to Mot. Transfer at 12 (citing

11 <u>Granite Equip. Leasing Corp. v. Hutton</u>, 84 Wn.2d 320, 326 (1974) ("Washington has a vital

12 interest in regulating the actions of corporations which do business within its territorial

13 boundaries so as to insure fair business practices therein.")). Washington's interest is

14 lessened by the class action nature of the case. Each of the other states with potential class

15 members in this action presumably have similar interests in protecting their citizens from

16 corporate malfeasance. This "public policy" factor is neutral to the Court's transfer analysis.

17

**11.**     **Conclusion Re: Defendants' Motion to Transfer**

18       After weighing the above factors in terms of number and relative strength, the Court

19 GRANTS Defendants' Motion to Transfer, docket no. 58, and TRANSFERS the case to the

20 District of Colorado. The Court is heavily swayed by the fact that this is a multi-state class

21 action lawsuit brought against five corporate Qwest entities, all of which are headquartered

22 in Colorado, and the fact that Colorado is where the majority of witnesses and documents are

23 located.

24 **III.**   **CONCLUSION**

25       The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to

26 Dismiss First Amended Complaint, docket no. 56. The Court GRANTS IN PART

Defendants' motion to dismiss and DISMISSES with prejudice Plaintiff's Relief from Unlawful Penalties claim (Count I). The Court DISMISSES without prejudice Vernon's unjust enrichment claim (Count II as to Vernon), Vernon's Washington CPA claim (Count III as to Vernon), and Durkin's claim under the Minnesota Prevention of Consumer Fraud Act (Count III as to Durkin). The Court DENIES IN PART Defendants' motion to dismiss and declines to dismiss Durkin or Sandquist's unjust enrichment claims, Sandquist's Washington CPA claim, and Plaintiffs' Declaratory Judgment Act claim.

The Court GRANTS Defendants' Motion to Transfer, docket no. 58, and TRANSFERS the case to the District of Colorado.

IT IS SO ORDERED.

DATED this 16th day of July, 2009.

Thomas S. Zilly
United States District Judge

ORDER  - 24